CHICAGO TRANSIT AUTHORITY, a
corporation, Plaintiff-Appellant,

v.

Bruce M. FLOHR, Deputy Federal Railroad Administrator and Brockman Adams, Secretary of Transportation, Defendants-Appellees.

No. 77–1137.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1977.

Decided Dec. 16, 1977.

Rehearing Denied March 6, 1978.

Norman J. Barry, Ronald F. Bartkowicz, Chicago, Ill., for plaintiff-appellant.

Robert E. Kopp, Barbara L. Herwig, Appellate Section, Civ. Div. Dept. of Justice, Washington, D. C., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Circuit Judge, KUNZIG,* Judge, and BAUER, Circuit Judge.

KUNZIG, Judge.

This case (of first impression at the appellate level) is before the court on direct appeal from a summary judgment entered by the District Court for the Northern District of Illinois, Eastern Division. In an action for a declaratory judgment brought by the Chicago Transit Authority (CTA, plaintiff-appellant) against the Federal Railroad Administrator and the Secretary of Transportation[1] (defendants-appellees), CTA sought a ruling that it is not a "railroad" and hence not subject to FRA railroad regulations. The district judge decided in favor of FRA, holding that "railroad" included urban rapid transportation.

The sole question in this case is one of congressional intent, specifically, whether the word "railroad" as used in the Railroad Safety Act includes urban rapid transportation systems of the type operated by CTA. Although the district court found that the common meaning of the word does *not* include systems such as the CTA [and we agree and hold that Congress, clearly not intending to reach CTA, used "railroad" in this common sense], the judge then erred in placing full reliance upon an overly broad dictionary definition, and decided for defendant. This holding flies in the face of, not only the common meaning of "railroad," but also, and more importantly, a plainly manifest congressional intent to deal only with railroads and not with urban rapid transit. We therefore reverse.

On December 11, 1974, the Federal Railroad Administration published revised regulations having to do with railroad accident reporting. 49 C.F.R. § 225. For purposes of the regulations, the FRA defined "railroad" as including "rapid transit," "subway," and "elevated" lines. 49 C.F.R. § 225.5. The sole authority for these regulations is the Railroad Safety Act of 1970, 45 U.S.C. §§ 421–41 (1970) which provides the Secretary of Transportation (through the FRA) with rule making powers concerning "all areas of railroad safety"[2] without specifically defining the word "railroad."

* Judge Robert L. Kunzig of the United States Court of Claims is sitting by designation.

1. Suit was originally brought against Asaph H. Hall, Administrator, and William T. Coleman, Secretary. *CTA v. Hall,* No. 75 C 3583 (N.D.Ill. 1976). Pursuant to Fed.R.Civ.P. 25(d)(1), Bruce M. Flohr, new Deputy Administrator, and Brockman Adams, new Secretary, are substituted parties. For convenience in discussion we hereinafter use the term Federal Railroad Administration (FRA) as synonymous with defendants-appellees.

2. The district judge determined that the Accident Reports Act, 45 U.S.C. §§ 38–43 (1970) clearly applies only to railroads engaged in interstate commerce and that it could not be held to afford a basis for the regulations in question. *CTA v. Hall,* No. 75 C 3583 (Supplemental Memorandum Opinion) (N.D.Ill., Oct. 21, 1976). FRA does not appeal that determination.

The effect of the new FRA railroad regulations just described is to require additional monthly and annual reports to the FRA of occurrences reflecting on the safety of "railroad" operations, subject to civil and criminal penalties for failure to comply. Urban mass transit systems such as the CTA, however, are already subject to safety requirements imposed by the Urban Mass Transit Administration (UMTA). *See* 49 U.S.C. §§ 1601–12 (1970 & Supp. V 1975). The FRA "railroad" regulations which seek to include mass transit within their ambit would thus constitute a further, and possibly even conflicting, regulatory network beyond that which is already imposed on CTA by UMTA.

The CTA operates the second largest public transit system in the United States, carrying on a typical weekday a ridership in excess of 600,000 and carrying each year more passengers than all of the nation's railroads combined. The CTA's rapid transit equipment[3] consists of electrically self-powered units, substantially smaller and lighter than railroad cars; CTA rapid transit cars do not use the rails of any railroad nor, conversely, can railroads use the CTA rails. The CTA receives funds from UMTA which account for some 80% of its capital expenditures, and CTA has been and continues to be subject to safety requirements of UMTA (both as to equipment and operational rules). As the risks, hazards, technology, and operating procedures of CTA, an urban rapid transit system, are far different from those involved in railroad operations, the considerations involved in formulating safety standards are also far different. Finally, in both the mass transit industry and in the railroad industry, the term "railroad" as it is commonly used, does not include rapid transit systems.[4]

The foregoing facts, uncontested in the court below, set up the controversy between CTA and the FRA. After January 1, 1975, the effective date of FRA's revised regulations on railroad accident reporting, the FRA demanded that CTA file the mandated railroad reports.

On October 24, 1975, CTA filed an action for declaratory judgment pursuant to 28 U.S.C. § 2201 seeking a determination that the CTA is not a railroad within the meaning of the Railroad Safety Act of 1970 and that FRA's regulations are, as applied to CTA, invalid.[5] Jurisdiction was predicated upon 28 U.S.C. § 1331.

CTA argues that the common meaning of the word "railroad" does not include urban rapid transit systems and that Congress must be presumed to use the word in its common meaning. Not resting there, CTA further maintains that the actual intent of Congress not to include rapid transit is clearly discernible in the legislative history. In addition, CTA takes the position that Congress would never have intended to designate two federal agencies, FRA and UMTA, each to have prime regulatory authority over urban mass transit.

In response, the FRA asserts that its own definition, which relies on Webster's dictionary, must be upheld if it is a "reasonable construction" even though not necessarily the one that Congress had in mind. FRA also explains that the resultant dual regulation is complementary to UMTA rather than duplicative. Finally, FRA advances its own reading of the legislative history to support the proposition that Congress meant to include rapid transit under the Act.

The district judge found for FRA, basing his decision on his assumption that Congress must be presumed to have known Webster's

3. In addition to its some 1100 rapid transit cars, the CTA operates approximately 2500 motor buses. The buses do not concern us on this appeal.

4. Record at 11, *CTA v. Hall*, No. 75 C 3583 (N.D.Ill.1976).

5. CTA alleged that FRA has repeatedly demanded that it file the reports and further alleged that, in order to comply with the regula-

tions, it would be required to hire additional personnel and to expend great sums of money. It is apparent, since the regulations provide for civil and criminal penalties, that the cost of noncompliance would be similarly high and that there is thus an actual controversy between CTA and defendants. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

dictionary meaning. The district judge so ruled despite his finding that the common understanding of the word does not include rapid transit.

■ While we recognize that this case poses a novel and difficult problem (neither party has cited, not have we been able to find an appellate decision construing this aspect of the Railroad Safety Act),[6] we cannot concur with the decision below. The only question in this case is congressional intent with respect to the word "railroad." We agree with CTA that the legislative history conclusively demonstrates that there was no intent to include rapid transit systems. Accordingly, and without finding it necessary to reach other arguments advanced by CTA, we reverse and hold for plaintiff.

Before turning to the crux of this case, we note briefly in passing the "common meaning" point advanced by CTA. Our rule in this circuit is that words in statutes are given their common meaning. *Sheehan v. Scott*, 520 F.2d 825, 829 (7th Cir. 1975). The district judge found that "[i]n the common understanding, a rapid transit line would not be included in the connotations of 'railroad.'" Indeed, he may well have reasoned that no one familiar with the New York subway, the Philadelphia elevated, or the CTA would ever think to call any of them a "railroad."

However, the district judge then reached for a dictionary and surprisingly held that "railroad" did include rapid transit lines. We feel in the instant case, he relied on the wrong legal tool. If the court had felt the common meaning of the word "railroad" was insufficient, unclear, or needed further explanation, at hand was an extensive legislative history of far greater import than one dictionary definition. Although we might well have been able to decide this controversy for plaintiff on the "common meaning" point alone, *Sheehan, supra*, since the court below proceeded from "common meaning" to reach a result we deem clearly in conflict with congressional intent, we

move now to analyze that congressional intent in detail as it bears on the meaning of the word "railroad."

■ As emphasized above, the crux of the case is congressional intent. Moreover, the legislative history is clear. The purpose of the Act was to provide comprehensive and uniform safety regulations in all areas of railroad operations. In so doing, Congress was proposing to fill gaps in statutory safety coverage which had grown so large as to render impossible any meaningful rail safety regulations. The Senate report emphasized this purpose:

"To date, scant attention has been paid to railroad safety at either the State or Federal levels. At present, there are several rail safety statutes, each one of which applies to some very specific safety hazard. The majority of these statutes are from 50 to 75 years old and were written when technology was quite different from what it is today. Some 95 percent of the causes of accidents on railroads are in no way covered by Federal statutes or by State law. The Federal Government, for example, has no jurisdiction over the design, construction, inspection, or maintenance of track, roadway, and bridges. Its authority with respect to freight and passenger cars applies only to safety appliances and certain aspects of the brake system. Car wheels, axles, which are major causative elements in many accidents, are not subject to Federal regulations." S.Rep. No. 91–619, 91st Cong., 1st Sess. 4 (1969) (hereinafter cited as Senate Report).

None of these gaps in railroad coverage has anything to do with mass transit systems.

A catalog of the hazards addressed by Congress further illustrates the purpose of the Act. Those hazards that Congress sought to eliminate include: transportation of dangerous chemicals and other hazardous materials; changes in freight car and locomotive sizes and weights; broken wheels and undue strain on couplers and draft

---

**6.** Defendants, however, have cited a district court case which seems, as an alternative holding, to interpret "railroad" to include a subway.

*United States v. Massachusetts Bay Transportation Authority*, 360 F.Supp. 698 (D.Mass. 1973). There are no circuit court decisions.

gears due to bigger cars; inability of longer freight cars to negotiate sharp curves, crossovers, and turnouts; buckling of jumbo tank cars without center sills when cars are subjected to compressive draw bar force; the harmonic rocking of freight cars with high centers of gravity; and high speed grade crossings. Senate Report at 4.

As evidence of these hazards, hundreds of accidents were summarized or referred to by the House and Senate Committees; every one concerned railroad transportation. Senate Report at 2–3; H.R. Rep. No. 91–1194, 91st Cong., 2d Sess. (1970) *reprinted in* [1970] U.S. Code Cong. & Admin.News, pp. 4104, 4106–08 (hereinafter cited as House Report with page citations to U.S. Code Cong. & Admin.News); Hearings on S. 1933 before the Senate Committee on Commerce, 91st Cong., 1st Sess., 7–15, 42–50, 110–32, 149–58 (1969) (hereinafter cited as Senate Hearings); Hearings on H.R. 7068, H.R. 14417, and H.R. 14478 [and S. 1933], before the House Subcommittee on Transportation and Aeronautics of the Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., Serial No. 91–51 at 38–9, 45–7, 57, 123–5, 130–40, 164–5, 215, 267–75 (1970) (hereinafter cited as House Hearings).

Again, none of these hazards is at all related to rapid transit operations, nor did any of the accidents cited involve rapid transit systems.

Similarly, a strong inference as to the purpose of the Act can be gleaned from the identity of the witnesses who testified.

In the 1969 hearings before the Senate Committee, "approximately 50 witnesses, representing almost every conceivable viewpoint relevant to safety on the railroads" testified. Remarks of Senator Hartke, 115 Cong. Rec. 40207 (Dec. 19, 1969). Included were the Secretary of Transportation, the Federal Railroad Administration, the Office of Hazardous Materials, the National Transportation Safety Board, the Department of Interior, the Department of Defense, railroad labor, railroad management, mayors, fire chiefs, chiefs of police, state police, health officials, military firefighters, individual railroad employees, concerned citizens, representatives of railroad passengers, the National Association of Regulatory Commissioners, the Chairman of the Consumer Product Safety Commission, and private attorneys. *Id.*; Senate Report at 2. For a complete list, *see* Senate Hearings iii–v.

In 1970, the House Subcommittee heard the testimony of 28 witnesses representing railroads, officials of state commissions regulating railroads, railway union representatives, and representatives of the National Transportation Safety Board and the FRA. For a complete list, *see* House Hearings III–VI.

No representatives of the rapid transit industry or of the Urban Mass Transportation Administration were invited to testify at any of the hearings. Neither was any representative of the Amalgamated Transit Union, which represents over 300,000 urban transit workers and whose offices are located in Washington, D.C., nor any member of the American Public Transportation Association which represents the management of eight U.S. urban rapid transit systems. *Not one witness testified concerning urban rapid transit.*

Thus, the legislative history is overwhelming. This court is convinced that Congress was not dealing with urban rapid transit, but with the conventional railroad network which spans the United States. Congress clearly never intended the word "railroad" as used in the Railroad Safety Act of 1970 to include urban rapid transportation.

Turning to the somewhat meager arguments advanced by defendants, we find the theory proposed by FRA citing *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), that a dictionary definition of "railroad" must be accepted, if reasonable. Defendants then carefully selected Webster's Dictionary,[7] ignoring such opposing authoritative definitions as:

*Black's Law Dictionary* which, after broadly defining "railroad," adds this caveat:

---

7. *Webster's Third New International Dictionary* (G. & C. Merriam Co. 1971).

"[W]hether or not 'railroad' includes roads operated by . . . electricity, cable-lines, etc., will generally depend upon the context of the statute in which it is found. The decisions on this point are at variance." *Black's Law Dictionary*, 1424 (rev. 4th ed. 1968).

*Ballentine's Law Dictionary* which, after defining "railroad," proceeds to define "street railway" as follows:

"A railroad upon tracks laid on and along the streets of a municipality, primarily for the accommodation of passengers going from one point to another in such municipality or to and from the suburbs . . . Not a railroad in the ordinary sense." *Ballentine's Law Dictionary*, 1223 (3d ed. 1969).

*Corpus Juris*, after defining "railroad" as a generic term, goes on to note that:

"While it may include street railroads and interurban railroads . . . the term standing alone ordinarily refers only to ordinary commercial railroads . . ." 74 C.J.S. *Railroads* § 1 at 313.

And, under "street railroad," *Corpus Juris* adds a caveat that the law recognizes a clear distinction between the terms and that when there is doubt:

". . . as to the true meaning of the term 'railroad' . . . the legislative intent is to be determined from the circumstances . . . and as so construed may or may not include a street railroad according to the purpose and intention of the particular statute . . ." 74 C.J.S. *Railroads* § 1 at 315.

We find it difficult to give credence to an argument which suggests one favorable dictionary definition selected from many opposing is reasonable, particularly when the specifically selected definition flies in the face of congressional intent. Indeed, the Supreme Court has long held that the defi-

nition of "railroad" is to be garnered by construing the statute as a whole. *Omaha & Council Bluffs Street Ry. Co. v. I.C.C.*, 230 U.S. 324, 33 S.Ct. 890, 57 L.Ed. 1501 (1913).

■ Next, defendants suggest the dual regulation of CTA would not be duplicative. Aside from the rather obvious point to be made that such an argument is scarcely the alpha and omega of reasons for FRA control of urban rapid transit, we wonder just how Congress could have intended all regulations to function in a complementary and non-duplicative manner if it never even called one witness in re the safety problems of urban rapid transit.

Defendants can glean little support from their non-duplicative argument, just as their suggestion is neither pertinent nor helpful that FRA penalties are necessary and provide better enforcement over CTA than do UMTA sanctions. Though UMTA does not have enforcement power identical to that of FRA,[8] it does have, as was pointed out at oral argument, the ultimate sanction. UMTA can withhold funds. CTA is currently receiving some 80% of its capital budget from UMTA,[9] and there is no evidence to suggest that CTA is not responsive to the proper safety regulations imposed on it by UMTA.

Finally, defendants propose their own reading of the legislative history to support the proposition that Congress meant to include urban rapid transit under the Railroad Safety Act of 1970.

FRA cites nearly identical language in both the Senate and House Reports to the effect that Congress intended to "encompass all those means of rail transportation as are commonly included" in the term and that Congress did not limit the definition to "common carrier by railroad" as used in the Interstate Commerce Act. Senate Report at 6; House Report at 4114. This language in no way supports FRA's position. The

---

**8.** FRA argues that the substantive safety powers of the Urban Mass Transportation Act were first added by a 1974 amendment to the UMTA Act. 49 U.S.C. § 1604a (1970 & Supp. V 1975). This is hardly an argument for inclusion of rapid transit in the Railroad Safety Act of 1970. If rapid transit had been reached by the Rail-

road Act, there would have been no reason to provide for it in the National Mass Transportation Assistance Act.

**9.** *See, e. g., Chicago Tribune*, Sept. 20, 1977, at 1, col. 8.

House Report goes on to say that "This new grant of authority [beyond that conferred by the Interstate Commerce Act] will enable the Secretary, if necessary, to regulate intrastate carriers" as well as interstate railroads. House Report at 4114. There is no inkling of intent to reach urban rapid transit.

FRA notes that the House Report states the bill would cover areas such as the "Metropolitan Transit (sic) Authority in New York." House Report at 4114. But this isolated reference when taken in context with the total legislative history, in no way supports defendant's theory. *See* House Hearings at 281–82 (discussing the New York system).

■ Faced with the massive evidence of congressional intent to deal with grave problems of railroad safety, it strains credulity to imagine that Congress, based on isolated snippets of language such as defendants have pointed out to us, intended to go so far outside the bounds of the testimony it heard as to take on wholesale regulation of the urban rapid transit industry *sub silentio.*[10]

It is true, as defendants' counsel said at oral argument, that the Congress may pass urban rapid transit legislation without holding hearings. It may also be true, as the defendants intimate in their brief, that Congress sometimes acts in a "perfunctory or casual manner." But we need not entertain such aspersions here. Indeed, from all indications, the Congress acted most carefully in this matter; not only did it hold hearings, but the hearings were voluminous and dealt fully with the railroad problems which Congress sought to solve. In this context, it is simply too much to suggest that urban rapid transit regulation is to be

found lurking somewhere within the compass of the Railroad Safety Act.

■ In summary, we find the only question in this case to be congressional intent with respect to the word "railroad" as used in the Railroad Safety Act of 1970. We agree with CTA that the legislative history is conclusive in demonstrating that Congress had no intention to reach rapid transit systems and we therefore hold that CTA is not a "railroad" as the term is used in the Railroad Safety Act of 1970 and hence not subject to FRA "railroad" regulations.

Accordingly, the judgment entered below, granting defendants' motion for summary judgment and denying plaintiff's cross-motion for summary judgment is reversed. This cause is remanded for further proceedings not inconsistent with the above opinion.

Reversed and Remanded.

---

10. We have earlier indications of congressional viewpoints on this subject in a 1968 proposed bill which never became law. A comprehensive railroad safety bill was introduced before Congress in 1968. The Department of Transportation drafted and sponsored the bill, and defined "railroad" very broadly—similarly to the definition now advanced by FRA.

In hearings before the House Committee on Interstate and Foreign Commerce, the scope of the bill was repeatedly criticized by Committee members as being too broad and including "ev-

erybody but the kitchen sink." Hearings on H.R. 16980 before the House Committee on Interstate and Foreign Commerce, 90th Cong., 2d Sess., Serial No. 90–39 at 41 (1968); *see also Id.* at 236, 298.

In response to the congressional criticism that the bill was too broad, the Department of Transportation assured the Committee that rapid transit operations would not be covered by the bill—not just once, but several times. *Id.* at 23, 246, 287.