(No. 71783.—

TRACY TEMPLETON, Appellant, v. CHICAGO AND NORTHWESTERN TRANSPORTATION COM- PANY, Appellee.

*Opinion filed July 30, 1992.—Rehearing denied November 30, 1992.*

BILANDIC, J., joined by HEIPLE, J., dissenting:

William J. Burke, of Demos & Burke, of Chicago (David A. Novoselsky, of counsel), for appellant.

Cornelius P. Callahan and Mark E. Christensen, of Butler, Callahan & Ehret, and George H. Brant and Myles L. Tobin (Hugh C. Griffin, of Lord, Bissell & Brook, of counsel), all of Chicago, for appellee.

JUSTICE CLARK delivered the opinion of the court:

The plaintiff, Tracy Templeton, was an employee of the defendant railroad, Chicago and Northwestern Transportation Company. On January 27, 1984, plaintiff was performing track work on a bridge located in Pekin, Illinois. Plaintiff fell through an opening in the bridge deck and landed on ice 31 feet below the bridge. Plaintiff filed suit in the circuit court of Cook County under the Federal Employers' Liability Act (45 U.S.C. §51 (1988)), to recover damages for the injuries he sustained as a result of the fall. A jury awarded plaintiff damages in the amount of $3.5 million after a reduction of 14% for plaintiff's contributory negligence.

Defendant appealed contending, *inter alia*, that the trial court improperly admitted into evidence "fall-protection" regulations issued by the Federal Occupational Safety and Health Administration (OSHA) and in-

structed the jury on the same. The appellate court reversed (211 Ill. App. 3d 489), and we granted plaintiff's petition for leave to appeal (134 Ill. 2d R. 315).

At issue in this case is whether OSHA's fall-protection regulations applied to the railroad bridge upon which plaintiff was working at the time of the accident. Defendant argues that OSHA's regulations did not apply because the Federal Railroad Administration (Railroad Administration) had asserted its exclusive authority over railroad bridges and, thereby, displaced OSHA's jurisdiction over the bridge. Defendant relies on a Railroad Administration policy statement issued in 1978 as support for this argument.

The Occupational Safety and Health Act of 1970 (29 U.S.C. §651 *et seq.* (1988)) was enacted to address the problems caused by personal injuries and illnesses arising out of working conditions. As part of the solution to this problem, Congress authorized the Secretary of Labor to "set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." (29 U.S.C. §651(b)(3) (1988).) Pursuant to the Occupational Safety and Health Act, OSHA has general authority to promulgate health and safety regulations relative to hazards arising out of working conditions.

At trial, plaintiff introduced into evidence two OSHA fall-protection regulations which are contained in OSHA's construction industry regulations. (See 29 C.F.R. §§1926.104, 1926.105 (1991).) One of the regulations entered into evidence provides in pertinent part:

> "Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical." 29 C.F.R. §1926.105(a) (1991).

Because this regulation was incorporated into the general industry standards applicable to all industries (29 C.F.R. §1910.12 (1991)), plaintiff claims it applies to work on railroad bridges.

Defendant argues that OSHA's fall-protection regulations do not apply to this case because the Railroad Administration has specifically preempted OSHA from regulating work on railroad bridges. Section 4(b)(1) of the Occupational Safety and Health Act provides in pertinent part:

> "Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies *** exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." (29 U.S.C. §653(b)(1) (1988).)

In order for another Federal agency, in this case the Railroad Administration, to preempt OSHA regulations under section 4(b)(1), that agency must have statutory authority to regulate a specific industry and it must exercise that authority over a particular working condition. *Southern Pacific Transportation Co. v. Usery* (5th Cir. 1976), 539 F.2d 386.

Under the Federal Railroad Safety Act of 1970 (45 U.S.C. §421 *et seq.* (1988)), the Railroad Administration is the primary agency responsible for regulating the railroad industry and has the statutory authority to issue safety regulations for railroads which would displace OSHA regulations. In 1978, the Railroad Administration issued a policy statement which outlined its position on those areas of the railroad industry for which the Railroad Administration was preempting OSHA regulations. (43 Fed. Reg. 10583 (1978).) Although the policy statement did not promulgate any new safety regulations, it was sufficient to preempt OSHA from exercising jurisdiction over *some* aspects of the railroad industry. See *Velasquez v. Southern Pacific Transportation Co.* (5th

Cir. 1984), 734 F.2d 216; *Secretary of Labor v. Consolidated Rail Corp.* (1982), 10 O.S.H. Cas. (BNA) 1577.

However, it is clear from the policy statement that the Railroad Administration did not intend to completely displace OSHA regulations. The policy statement envisions an evolving, cooperative relationship between the two Federal agencies. For example, in the policy statement the Railroad Administration stated the following:

"[The Railroad Administration] recognizes that OSHA currently is not precluded from exercising jurisdiction with respect to conditions not rooted in railroad operations nor so closely related to railroad operations as to require regulation by [the Railroad Administration] in the interest of controlling predominant operational hazards.

\* \* \*

\*\*\* We believe the policy set forth in this document will assure that each of the principal Federal agencies charged with the responsibility for carrying out this program, that is, [the Railroad Administration] and OSHA, will concentrate its efforts in those areas in which it possesses the greatest experience and expertise. In those cases in which there may be some question as to which is the primary regulatory agency, *cooperative efforts between the two agencies should avoid the creation of regulatory gaps* on the one hand, or unnecessary duplication on the other. At any time that a hazardous working condition impacts upon the overall safety of railroad operations, [the Railroad Administration] will take the initiative in developing a proper regulatory response." (Emphasis added.) 43 Fed. Reg. 10587-90 (1978).

In the policy statement, the Railroad Administration specifically addressed the applicability of 13 separate categories of OSHA regulations. Defendant cites the following passage from the Railroad Administration's discussion of OSHA's "walking-working surfaces" regulations as proof that the Railroad Administration intended to displace OSHA from regulation of all working conditions on railroad bridges:

"OSHA regulations concerning working surfaces deal with such matters as ladders, stairways, platforms, scaffolds and floor openings. Generally, these regulations are applicable in railroad offices, shops and other fixed work places. There are three principal exceptions to the rule. ***

***

Third, the OSHA regulations would not apply to ladders, platforms, and other surfaces on signal masts, cantenary systems, railroad bridges, turntables, and similar structures or to walkways beside the tracks in yards or along the right-of-way. These are areas which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety." (43 Fed. Reg. 10587 (1978).)

The OSHA regulations referred to in the above passage require the use of railings, toeboards and hole covers to be placed over or around an opening in a floor or wall surface. (See 29 C.F.R. § 1910.23 (1991).) Based on the policy statement, these OSHA regulations are not applicable to railroad bridges. *Velasquez*, 734 F.2d at 218.

However, as noted above, the fall-protection regulations at issue in this case are included in OSHA's construction industry regulations. The Railroad Administration addressed separately the applicability of OSHA construction regulations. It is unclear from this section of the policy statement whether the Railroad Administration intended to displace OSHA fall-protection regulations. Specifically, the Railroad Administration stated:

"To the extent that hazardous construction working conditions do not fall within [the Railroad Administration's] exercise of authority relating to the safety of railroad operations, the OSHA standards apply according to their terms in the railroad industry." (43 Fed. Reg. 10589 (1978).)

This section is ambiguous in that it is not clear which "hazardous construction working conditions" are within the Railroad Administration's exercise of exclusive authority.

When construing an administrative regulation, " 'a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. \*\*\* [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " (*Udall v. Tallman* (1965), 380 U.S. 1, 16-17, 13 L. Ed. 2d 616, 625, 85 S. Ct. 792, 801, quoting *Bowles v. Seminole Rock & Sand Co.* (1945), 325 U.S. 410, 413-14, 89 L. Ed. 1700, 1702, 65 S. Ct. 1215, 1217.) With this principle in mind, it is significant to note that the Railroad Administration does not interpret its policy statement as preempting OSHA from enforcing the fall-protection regulations on railroad bridges.

In 1991, the Railroad Administration issued a notice of proposed rulemaking in which the agency announced its intent to promulgate fall-protection regulations substantially similar to the OSHA regulations at issue here. (See 56 Fed. Reg. 3434 (proposed Jan. 30, 1991).) In the jurisdictional background section of the 1991 notice, the Railroad Administration quoted the "walking-working surface" section of the policy statement and stated:

"[The Railroad Administration] intended to displace OSHA regulations with respect to the surfaces on bridges, *i.e.*, track structures, but *did not intend to prevent OSHA from exercising its more general responsibilities for the safety of railroad workers with respect to fall protection and respiratory equipment.*" (Emphasis added.) (56 Fed. Reg. 3435 (proposed Jan. 30, 1991).)

This interpretation of the policy statement indicates that the Railroad Administration itself believes OSHA had jurisdiction over the working condition at issue in this

case. Because we are construing a Railroad Administration regulation, this interpretation is controlling " 'unless it is plainly erroneous or inconsistent with the regulation.' " *Udall*, 380 U.S. at 16-17, 13 L. Ed. 2d at 625, 85 S. Ct. at 801, quoting *Bowles*, 325 U.S. at 414, 89 L. Ed. at 1702, 65 S. Ct. at 1217.

Defendant contends that the above-quoted Railroad Administration interpretation of the policy statement is not controlling because it is inconsistent with the clear language of the 1978 policy statement. Defendant argues that the Railroad Administration's 1991 interpretation provides nothing more than an attempt to retroactively revise the Railroad Administration's prior statement. It is clear, as defendant points out, that the 1978 policy statement intended to displace OSHA regulations from "railroad operations." What is unclear, however, is whether the use of safety nets and other fall-protection devices on railroad bridges impacts upon "railroad operations." We note that the policy statement is sufficiently ambiguous to support either interpretation. Indeed, the Railroad Administration recognized such ambiguity when it stated:

> "[T]o the extent matters addressed by the OSHA regulations are connected with or relate to railroad operations and may interact with or create operational hazards, it may be necessary for [the Railroad Administration] and OSHA to consult concerning the interpretation or modification of such standards. As the primary regulatory agency concerned with railroad safety, [the Railroad Administration] will not hesitate to adopt its own standards to assure a safe environment for railroad operations and to promote regulatory consistency." (43 Fed. Reg. 10587 (1978).)

Moreover, the policy statement was a statement of general principle, rather than a definitive declaration. 43 Fed. Reg. 10587 (1978).

The Railroad Administration addressed this ambiguity again in the 1991 notice of proposed rulemaking when it stated:

"[T]hese distinctions [between bridge surfaces and fall protection] have proved confusing to the regulated community, railroad employees, inspectors, and *** adjudicatory bodies. [The Railroad Administration] has recently received a number of legal memoranda addressing these issues from railroads and railroad associations: all of these evidence this confusion." (56 Fed. Reg. 3435 (proposed Jan. 30, 1991).)

In fact, defendant is one of the railroads referred to by the Railroad Administration as having submitted legal memoranda. 56 Fed. Reg. 3436 (proposed Jan. 30, 1991).

Based on the above excerpts from both the 1978 and the 1991 Railroad Administration pronouncements, we are unable to conclude that the Railroad Administration has unambiguously preempted OSHA from regulating the use of fall-protection equipment on railroad bridges. As the policy statement is subject to two competing interpretations which are equally reasonable, we believe the most appropriate interpretation is that which the Railroad Administration itself has adopted. Therefore, we hold that the OSHA fall-protection regulations applied to the present case.

We note that the *Velasquez* decision on which defendant and the appellate court relied is distinguishable. In *Velasquez*, the plaintiff fell through an opening in the track on a railroad bridge and landed on a creek bed *nine feet* below. The plaintiff in that case introduced evidence that "under OSHA regulations, rope barricades and a toeboard around the perimeter of the opening would have been appropriate measures." (*Velasquez*, 734 F.2d at 218.) From these facts it is clear that the plaintiff in *Velasquez* attempted to introduce evidence of

OSHA "walking-working surface" regulations. The OSHA safety-net regulations did not apply because the plaintiff in *Velasquez* was substantially below the 25-foot threshold level at which a safety net is required.

In *dicta*, the *Velasquez* court noted that OSHA's construction regulations did not apply because the policy statement displaced those regulations for construction work done on railroad bridges. (*Velasquez*, 734 F.2d at 218 n.1.) However, at the time of its decision, the *Velasquez* court did not have the benefit of the Railroad Administration's 1991 interpretation of the policy statement. Because the Railroad Administration's 1991 notice of proposed rulemaking contains an interpretation which is not plainly erroneous, we will follow the Railroad Administration's interpretation rather than that of the *Velasquez* court. (*Udall*, 380 U.S. at 16-17, 13 L. Ed. 2d at 625, 85 S. Ct. at 801.) In light of the Railroad Administration's 1991 interpretation of its own regulations, and the fact that *Velasquez* is distinguishable, we need not consider the question of whether Illinois courts are bound to follow the decisions of lower Federal courts when interpreting Federal law.

We are also aware that in 1988, Congress passed the Rail Safety Improvement Act of 1988, which requires the Railroad Administration to promulgate regulations "for the safety of maintenance-of-way employees, including standards for bridge safety equipment, such as nets, walkways, handrails, and safety lines." (45 U.S.C. §431(n) (1988).) Defendant argues that this provision indicates that Congress believed that the Railroad Administration is the most appropriate agency to regulate employee safety on railroad bridges. Clearly, when the Railroad Administration issues its final regulations on this matter or indicates that the working condition should go unregulated, OSHA will be displaced from enforcing its corresponding regulations. However, the 1988

statute does not answer the question of whether, in 1984, the Railroad Administration had already made such a determination relative to this working condition. Moreover, we do not believe Congress intended this statute to displace OSHA regulations which would otherwise apply. Therefore, we find the Rail Safety Improvement Act of 1988 does not resolve the dispute in this case.

For the foregoing reasons, we reverse the judgment of the appellate court and remand to that court for consideration of the remaining issues raised by defendant's appeal.

*Reversed and remanded.*

JUSTICE BILANDIC, dissenting:

I respectfully dissent because, in my opinion, under the facts of this case, the Federal Railroad Administration (Railroad Administration) has preempted the application of the Federal Occupational Safety and Health Administration (OSHA) "fall-protection" regulations.

As the majority correctly notes, the Railroad Administration is the primary agency responsible for regulating the railroad industry. Congress enacted the Federal Railroad Safety Act of 1970 (45 U.S.C. §421 *et seq.* (1970)) for the purpose of providing "comprehensive and uniform safety regulations in all areas of railroad operations." (*Chicago Transit Authority v. Flohr* (7th Cir. 1977), 570 F.2d 1305, 1308.) Under that act, the Railroad Administration is expressly given the authority and responsibility to prescribe all rules, regulations and standards necessary for promoting safety in all areas of railroad operations. 45 U.S.C. §431 (1970).

The "fall-protection" regulations at issue here were enacted by OSHA. It is undisputed that OSHA is *not* the agency primarily responsible for regulating safety concerns within the railroad industry. Instead, OSHA, pursuant to the Occupational Safety and Health Act of 1970

(29 U.S.C. §651 *et seq.* (1970)), has general authority to regulate working conditions that affect the occupational safety and health of employees in general, regardless of the industry in which they are employed. Thus, under the Federal regulatory scheme established by Congress, OSHA has generic authority to promulgate safety standards for industries affecting interstate commerce while the Railroad Administration has specific authority to promulgate safety standards for the railroad industry.

Obviously, this scheme created the potential for dual regulation by both the Railroad Administration and OSHA with respect to health and safety concerns in the railroad industry. Congress expressly acknowledged this potential problem and made provisions to avoid such overlapping regulation. Section 4(b)(1) of the Occupational Safety and Health Act states that its terms *will not apply* to working conditions as to which another Federal agency "exercise[s] statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." (29 U.S.C. §653(b)(1) (1988).) Thus, by the very terms of the Occupational Safety and Health Act, OSHA regulations such as the "fall-protection" regulations at issue here are preempted when another Federal agency, such as the Railroad Administration, exercises statutory authority over a particular working condition.

In 1978, the Railroad Administration issued a policy statement in which it clearly and unequivocally stated its intent to exercise its statutory authority over "the safety of railroad operations." (43 Fed. Reg. 10589 (1978).) In that statement, the Railroad Administration thoroughly condemned "piecemeal regulation of individual hazards in [railroad operations] by any other agency of government," calling such a practice "disruptive and contrary to the public interest." 43 Fed. Reg. 10586 (1978).

To avoid such piecemeal regulation, the Railroad Administration's policy statement specifically indicated over which railroad working conditions it was exercising its authority and thereby displacing any OSHA regulations that might otherwise apply. Among those aspects of the railroad industry over which the Railroad Administration asserted its authority was the precise working condition at issue in this case, that is, working conditions on railroad bridges. The 1978 policy statement provided, *inter alia*, that "OSHA regulations would not apply to ladders, platforms and other surfaces on *** railroad bridges." (43 Fed. Reg. 10587 (1978).) The Railroad Administration stated that it was asserting exclusive jurisdiction over this aspect of the industry because "[t]hese are areas which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety." 43 Fed. Reg. 10587 (1978).

The majority concedes that this policy statement was sufficient to preempt OSHA's jurisdiction over some aspects of the railroad industry. (151 Ill. 2d at 332.) However, the majority concludes that the policy statement is "ambiguous" as to whether the OSHA "fall-protection" regulations are displaced. In my view, the majority ignores the clear language of the policy statement.

At the core of the majority's finding of ambiguity is the fact that the "fall-protection" regulations are included as part of OSHA's "construction industry regulations." The majority notes that the 1978 policy statement separately addressed the applicability of the OSHA "construction industry regulations," stating:

" 'To the extent that hazardous construction working conditions do not fall within [the Railroad Administration's] exercise of authority relating to the safety of railroad operations, the OSHA standards apply according to their

terms in the railroad industry.' " (151 Ill. 2d at 330, quoting 43 Fed. Reg. 10589 (1978).)

The majority determines that this section makes the 1978 policy statement ambiguous because "it is not clear which 'hazardous construction working conditions' are within the Railroad Administration's exercise of exclusive authority." (151 Ill. 2d at 330-31.) I believe that the majority's conclusion that the 1978 policy statement is ambiguous is patently erroneous.

The 1978 policy statement clearly mandates that OSHA's "construction industry regulations" apply to a particular working condition in the railroad industry *only if* the Railroad Administration has not exercised its authority over that condition. In this case, the Railroad Administration *has* in fact exercised its exclusive authority over the hazardous working condition at issue. The 1978 policy statement clearly states that the Railroad Administration is exercising its authority, to the exclusion of OSHA, over working conditions on *railroad bridges*. Thus, working conditions on railroad bridges clearly constitute a "hazardous construction working condition" over which the Railroad Administration has exercised its authority and displaced the authority of OSHA. The OSHA "construction industry regulations," including the "fall-protection" regulations, are therefore inapplicable to working conditions on railroad bridges. There is no ambiguity on this point; the policy statement specifically preempts OSHA from regulating work on railroad bridges.

Because the policy statement unambiguously places the regulation of safety and health concerns of workers on railroad bridges exclusively within the province of the Railroad Administration, it must be applied according to its terms. There is no justification for looking to outside sources to discern the meaning of an unambiguous statement. (2A N. Singer, Sutherland on Statutory Construc-

tion §46.04 (5th ed. 1992).) The majority ignores this principle and looks to extrinsic sources to "interpret" the 1978 policy statement. Moreover, the outside source upon which the majority ultimately relies is not persuasive. The majority seeks to discern the intent behind the 1978 statement by looking to language contained in the preamble to a "notice of proposed rulemaking" issued by the Railroad Administration in *1991*. Initially, I must seriously question the usefulness of an "interpretation" that is issued *13* years *after* the document it purports to interpret. (See *Colt Industries, Inc. v. United States* (D.C. Cir. 1989), 880 F.2d 1311, 1313.) An administrative interpretation is not entitled to controlling weight when the interpretation is not relatively contemporaneous with the statement being interpreted. (2B N. Singer, Sutherland on Statutory Construction §49.08 (5th ed. 1992); see also *Drew v. Lawrimore* (D.C.S.C. 1966), 257 F. Supp. 659, 669-70.) I agree with the defendant that the Railroad Administration's 1991 "interpretation" constitutes nothing more than an attempt to retroactively revise their prior statement. Such "retroactive history" is worthy of little or no weight. (See *Colt Industries*, 880 F.2d at 1313 (*subsequent* legislative history is entitled to little weight).) Moreover, I would point out that the 1991 "interpretation" was issued over seven years after the plaintiff's accident and over one year after the trial in this cause was completed.

Even more importantly, the 1991 "interpretation" is contrary to the clear mandate of the Railroad Administration's 1978 policy statement regarding OSHA's authority over railroad bridges. The plain language of the 1978 statement preempts OSHA's jurisdiction over working conditions on railroad bridges. The 1991 "interpretation" is in direct contravention of that mandate. As the majority notes, an administrative interpretation of a regulation is not controlling where it is inconsistent with

the plain language of the regulation itself. (151 Ill. 2d at 332.) Thus, the 1991 "interpretation" of the 1978 policy statement is both untimely and directly contradicted by the plain language of the statement itself. Such an "interpretation" should not be accorded any significance by this court.

In addition to being in violation of basic rules of construction, the majority's holding is in error because it creates the exact problem the Railroad Administration sought to avoid when it issued the 1978 policy statement, namely, overlapping regulation of the same occupational hazard by two governmental agencies. That this is the result is easily illustrated. According to the majority, the 1978 policy statement *did* preempt OSHA's "walking-working surfaces" regulations, but did *not* preempt OSHA's "fall-protection" regulations. It is quite evident, however, that these two sets of regulations are aimed at the same occupational hazard.

OSHA's "walking-working surfaces" regulations require the use of railings, toeboards and holecovers over and around floor openings. According to the majority, then, the Railroad Administration has the sole authority to determine whether *these* safety devices are needed on railroad bridges. OSHA's "fall-protection" regulations require, for workplaces situated more than 25 feet above the ground, the use of safety nets or other devices intended to prevent workers from falling. The majority thus concludes that the Railroad Administration does not have the sole authority to determine whether *these* safety devices are needed on railroad bridges. Rather, OSHA has the authority to determine the necessity of such safety devices.

It cannot be disputed that railings, toeboards and holecovers over and around floor openings, and safety nets underneath a floor opening, are aimed at protecting workers from the same hazard, namely, that of *falling*.

Thus, according to the majority, the Railroad Administration *intended* that the *same* working hazard be regulated by two separate agencies, OSHA and the Railroad Administration. This result directly conflicts with the Railroad Administration's express condemnation of "piecemeal regulation of individual hazards" by more than one governmental agency. (43 Fed. Reg. 10586 (1978).) This result is also illogical. There is no rational reason for the Railroad Administration to distinguish between the "walking-working surfaces" regulations and the "fall-protection" regulations, as they pertain to railroad bridges. To say that the Railroad Administration believed that the use of *railings and holecovers* on railroad bridges was "so much a part of the [railroad] operating environment" (43 Fed. Reg. 10587 (1978)) that they must be regulated by the Railroad Administration, but that the use of *safety nets* on railroad bridges is not, is absurd. Clearly, the Railroad Administration did not intend such an illogical result. The majority's decision, however, results in just that—piecemeal regulation of a single hazard by two separate agencies.

The majority's decision is also in conflict with clear Federal precedent on this precise issue. *Velasquez v. Southern Pacific Transportation Co.* (5th Cir. 1984), 734 F.2d 216, is materially indistinguishable from the instant case. In *Velasquez*, the plaintiff, a railroad worker participating in repair work on a railroad bridge, fell through an opening in the bridge which the workers had created so that they could reach the area underneath the track. The plaintiff filed an action under FELA against his railroad-employer. At trial, the plaintiff's expert was allowed to testify that OSHA regulations applied to the defendant railroad and that, under OSHA, rope barricades and toeboards around the opening would have been appropriate. The judgment entered in the plaintiff's favor was subsequently reversed by the Fifth Circuit

Court of Appeals, which held that the reference to the OSHA regulations was reversible error. *Velasquez*, 734 F.2d at 218.

The *Velasquez* court determined that the admission of the OSHA regulations was improper because the Railroad Administration specifically preempted those regulations in the 1978 policy statement. The Court of Appeals noted that the policy statement clearly provided that OSHA regulations would not apply to railroad bridges. The court determined that the Railroad Administration's assertion of jurisdiction over railroad bridges in the 1978 statement clearly preempted and displaced *both* the OSHA regulations requiring rope barricades and toeboards, *and* the OSHA "construction regulations." (*Velasquez*, 734 F.2d at 218.) Thus, *Velasquez* is clear precedent for the proposition that the OSHA "fall-protection" regulations were displaced by the 1978 policy statement. This court, when addressing a *federally created* cause of action, such as FELA, should accord, if not controlling weight, at least great deference to the decisions of lower Federal courts. See *Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 199-200.

I disagree with the majority's attempt to distinguish *Velasquez*. First, the majority asserts that *Velasquez* is distinguishable because the plaintiff in that case introduced only evidence of OSHA's "walking-working surface" regulations and *not* the "fall-protection" regulations at issue in this case. (151 Ill. 2d at 333-34.) However, this distinction is without merit because the *Velasquez* court specifically held that OSHA's "construction regulations" were preempted by the 1978 policy statement. (*Velasquez*, 734 F.2d at 218.) Moreover, as I discussed previously, no reasoned basis for distinguishing between the "walking-working surface" regulations and the "fall-protection" regulations can be advanced in this case.

The majority also attempts to distinguish *Velasquez* on the ground that that court did not have the "benefit" of the Railroad Administration's 1991 "interpretation" of the 1978 statement. (151 Ill. 2d at 334.) As noted, that "interpretation" is entitled to little or no weight because it conflicts with the express terms of the statement which it purports to interpret. Thus, neither of the arguments proffered by the majority provide a legitimate basis for distinguishing *Velasquez*.

In conclusion, I believe that the interpretation of the 1978 Railroad Administration policy statement applied by the majority is clearly erroneous. I would uphold the judgment of the appellate court holding that the 1978 statement preempted the OSHA "fall-protection" regulations in this case and that the admission of those regulations at trial constituted reversible error. For these reasons, I dissent.

JUSTICE HEIPLE joins in this dissent.