UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RESEARCH TRIANGLE REGIONAL PUBLIC
TRANSPORTATION AUTHORITY,
                    *Petitioner,*

v.

UNITED STATES OF AMERICA; FEDERAL
RAILROAD ADMINISTRATION,
                    *Respondents.*

AMERICAN PUBLIC TRANSPORTATION
ASSOCIATION; NEW STARTS WORKING
GROUP,
 *Amici Curiae Supporting Petitioner.*

No. 03-1283

On Petition for Review of a Decision
of the Federal Railroad Administration.

Argued: October 28, 2003

Decided: December 15, 2003

Before WILKINS, Chief Judge, and WIDENER and
SHEDD, Circuit Judges.

Petition denied by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Kevin Michael Sheys, KIRKPATRICK & LOCKHART,
L.L.P., Washington, D.C., for Petitioner. Peter Jay Plocki, Senior
Trial Attorney, Office of the General Counsel, U.S. DEPARTMENT

OF TRANSPORTATION, Washington, D.C., for Respondents. **ON BRIEF:** Edward J. Fishman, KIRKPATRICK & LOCKHART, L.L.P., Washington, D.C.; Dora V. Torseth, General Counsel, RESEARCH TRIANGLE REGIONAL PUBLIC TRANSPORTATION AUTHORITY, Research Triangle Park, North Carolina, for Petitioner. Kirk K. Van Tine, General Counsel, Paul M. Geier, Assistant General Counsel for Litigation, Dale C. Andrews, Deputy Assistant General Counsel for Litigation, Jeffrey J. Amato, Office of the General Counsel, U.S. DEPARTMENT OF TRANSPORTATION, Washington, D.C.; S. Mark Lindsey, Chief Counsel, Daniel C. Smith, Assistant Chief Counsel, David H. Kasminoff, Office of the Chief Counsel, FEDERAL RAILROAD ADMINISTRATION, Washington, D.C., for Respondents. Daniel Duff, Chief Counsel, AMERICAN PUBLIC TRANSPORTATION ASSOCIATION, Washington, D.C.; Robert Bergen, HOLLAND & KNIGHT, L.L.P., New York, New York, for Amici Curiae.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The Research Triangle Regional Public Transportation Authority, locally known as the Triangle Transit Authority ("TTA"), asked the Federal Railroad Administration ("FRA") whether it would assert jurisdiction over the first phase of a passenger rail system that TTA intends to operate in the Raleigh-Durham area of North Carolina. TTA argued that FRA should not assert jurisdiction over its project, except to a limited extent, because the passenger rail system is an urban rapid transit system, which Congress specifically excluded from FRA's jurisdiction. After meeting with TTA officials, and upon consideration of plans and estimates provided by TTA as well as the final environmental impact statement submitted by TTA, FRA issued a letter ruling concluding that it has jurisdiction over the TTA project. TTA petitions for review of FRA's ruling; we deny the petition.

## I.

TTA is a regional public transportation provider serving Durham, Orange, and Wake Counties in North Carolina (the "Research Triangle"). TTA currently operates ground transportation services, and it has designed a passenger rail system scheduled to begin operations in 2007-08. This passenger rail system will be developed in three phases. Phase I is a roughly 35-mile line between Raleigh and Durham, connecting Duke University, downtown Durham, Research Triangle Park, the towns of Morrisville and Cary, North Carolina State University, downtown Raleigh, and North Raleigh. Phase II will enhance regional bus transit and rail extensions, and Phase III will extend the rail system to more outlying areas. TTA has designed this passenger rail system to address new transportation needs resulting from rapid population growth, urbanization, and an influx of technology and manufacturing firms in the Research Triangle.

Although TTA has indicated that Phase I of its rail system will comply with a number of FRA safety regulations — concerning vehicle safety, signaling systems, and grade crossing warning systems — TTA does not wish to be bound by all of FRA's regulations. Following a procedure outlined in FRA's regulations, TTA asked FRA to determine whether it would assert jurisdiction over Phase I of the rail system. In considering TTA's request, FRA officials met with TTA officials to discuss the particular characteristics and projected uses of Phase I of the rail system. TTA submitted additional materials to FRA, and FRA officials again met with TTA officials to discuss the project. Based on the information submitted by TTA and its interviews with TTA officials, FRA determined that Phase I of TTA's passenger rail system is subject to FRA's jurisdiction.

FRA determined that it has jurisdiction to regulate the TTA project because, it concluded, the TTA project is a "railroad" as that term is defined in the Federal Railroad Safety Act. The statute specifically defines "railroad" to include "commuter or other short-haul railroad passenger service[s]" and "high speed ground transportation systems that connect metropolitan areas." 49 U.S.C. § 20102(1)(A). The term "railroad" does not include "rapid transit operations in an urban area that are not connected to the general railroad system of transportation." *Id.* § 20102(1)(B). The statute does not define "commuter or

other short-haul railroad passenger service" or "rapid transit operations in an urban area."

In assessing its jurisdiction over the TTA project, FRA applied its Statement of Agency Policy Concerning Jurisdiction Over the Safety of Passenger Operations and Waivers Related to Shared Use of the Tracks of the General Railroad System by Light Rail and Conventional Equipment (the "Policy Statement"), 65 Fed. Reg. 42,529 (July 10, 2000) (codified at 49 C.F.R. Part 209 Appendix A). FRA first noted that it would not presume TTA's rail system to be a commuter project since Congress had not characterized it as such in any statute. *See id.* at 42,544 (stating that FRA will honor statutory characterizations of specific operations as commuter operations). FRA then noted that it would not presume TTA's rail system to be rapid transit since it was not a subway or elevated system and featured several highway-rail grade crossings. *See id.* at 42,545 (describing the rapid transit presumption).

Since no presumption applied to the TTA system, FRA analyzed the specific characteristics of this project to determine whether it should be characterized as commuter or rapid transit. *See id.* at 42,544-45. According to the Policy Statement, proper characterization of a rail system depends upon three general factors: (1) the geographic scope of the rail service, (2) the primary function of the rail service, and (3) the frequency of service. *Id.* Specifically, FRA will likely deem an operation to be a commuter operation if:

> [1] The system serves an urban area, its suburbs, and more distant outlying communities in the greater metropolitan area, [2] The system's primary function is moving passengers back and forth between their places of employment in the city and their homes within the greater metropolitan area, and moving passengers from station to station within the immediate urban area is, at most, an incidental function, and [3] The vast bulk of the system's trains are operated in the morning and evening peak periods with few trains at other times.

*Id.* By contrast, FRA will likely deem an operation to be rapid transit if:

[1] The operation serves an urban area (and may also serve its suburbs), [2] Moving passengers from station to station within the urban boundaries is a major function of the system and there are multiple station stops within the city for that purpose (such an operation could still have the transportation of commuters as one of its major functions without being considered a commuter railroad), and [3] The system provides frequent train service even outside the morning and evening peak periods.

65 Fed. Reg. at 42,545.

With respect to geographic scope, FRA determined that the TTA system would "connect two non-contiguous cities (Raleigh and Durham) whose centers are quite far apart, and run through another community of considerable size (Cary)." While FRA acknowledged that it might be possible for two cities to have a single urban core, that is not the case with Raleigh and Durham, each of which has a distinct downtown center. The fact that Amtrak intercity rail service already serves Raleigh, Durham, and Cary suggested to FRA that these cities, while perhaps part of a larger metropolitan area, do not constitute a single urban area.

FRA further determined that the primary function of TTA's rail system would be to move riders from their homes to their workplaces. FRA based this conclusion on several facts: (1) TTA's final environmental impact statement disclosed that the system was intended to increase access to major employment centers, (2) the rail corridor is located in high-employment areas and station locations were selected based on their proximity to employment centers, (3) the substantial majority of trips would be work-related, and (4) TTA's decision to use diesel multiple unit ("DMU") vehicles (rather than more traditional light rail vehicles) was motivated by its understanding that this system would facilitate commuter transportation.

Finally, FRA determined that the "[t]he regional railroad will operate on a frequency of service that is much more indicative of commuter service than urban rapid transit." Comparing TTA's plan to operate at intervals of 15 minutes in peak periods and 30 minutes in off-peak periods with frequencies of various types of urban transpor-

tation systems, FRA concluded that TTA's system fell at the low end of commuter operations. Thus, even if TTA were able to reduce its intervals to 10 minutes in peak hours and 20 minutes in off-peak hours, the system would still look more like a commuter operation than a rapid transit operation. According to FRA, "[n]one of the intervals that TTA contemplates are like those of urban rapid transit systems, which can operate as many as two dozens trains an hour in peak periods."

Having concluded that the factors identified in the Policy Statement suggested a commuter rail operation, FRA specifically addressed TTA's argument that its system should be treated as rapid transit because 76% of all trips would have both origin and destination within a single city. At the outset, FRA noted that TTA had failed to provide requested information concerning methods of statistical analysis used to generate the 76% figure. FRA doubted the accuracy of this figure because the data on which it was based were derived from current bus use patterns, not the model specifically designed for rail use. According to FRA, using current bus use numbers fails to account for the likelihood that the addition of rail service will alter travel patterns. Even assuming the 76% figure to be accurate, FRA noted that it was actually consistent with a commuter operation when taken in proper context. Since the TTA system would be linked to bus routes and highways to facilitate easy transfers, "many of the relatively short rail trips that TTA projects will occur within a single jurisdiction will be made by commuters who are using the rail system as the intermediate or final leg of a much longer journey."

In the end, FRA determined that the TTA project looked more like a commuter rail operation than a rapid transit operation. Accordingly, the statutory exclusion was inapplicable, and FRA could assert jurisdiction over the project as a "commuter or other short-haul railroad passenger service in a metropolitan or suburban area." As a result, FRA determined that Phase I of the TTA passenger rail system would be "subject to all of FRA's safety regulations." TTA filed this petition for review, arguing that FRA had improperly characterized its rail system as a commuter operation rather than a rapid transit operation.

## II.

## A.

Under the Administrative Procedures Act, an agency's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The question presented in this appeal is whether FRA's interpretation of the statute defining its jurisdiction is lawful. If that statute speaks clearly to "the precise question at issue" — whether Phase I of the TTA system is a rapid transit operation — then we must "give effect to the unambiguously expressed intent of Congress." *Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). If the statute is "silent or ambiguous" as to the issue presented here, then we must determine whether the FRA's assertion of jurisdiction reflects "a permissible construction" of the statute. *Id.* at 218 (citing *Chevron*, 467 U.S. at 843). "Hence we must decide (1) whether the statute unambiguously forbids the [a]gency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible." *Id.*

FRA's jurisdiction is limited by the definition of "railroad" found in 49 U.S.C. § 20102(1). That statute provides that the term "railroad" includes "commuter or other short-haul railroad passenger service in a metropolitan or suburban area" but excludes "rapid transit operations in an urban area that are not connected to the general railroad system of transportation." 49 U.S.C. § 20102(1)(A)(i), (B). The statute does not define "commuter or other short-haul railroad passenger service" or "rapid transit operations in an urban area." Because Congress did not define these critical terms, we cannot say that the statute unambiguously forbids FRA's assertion of jurisdiction over the TTA system. *See Barnhart*, 535 U.S. at 218 (stating that "silence, after all, normally creates ambiguity").[1]

---

[1]TTA's reliance upon *Chicago Transit Authority v. Flohr*, 570 F.2d 1305 (7th Cir. 1977), is misplaced. *Flohr* held that Congress intended the term "railroad" not to include urban rapid transportation. *Id.* at 1308. The plain text of the current statute resolves that question by expressly excluding urban rapid transit from the definition of "railroad"; the question here is just what constitutes an urban rapid transit operation. The statute is silent on that issue, and so is *Flohr*.

In determining whether the FRA letter ruling reflects a permissible construction of the statute, we must decide what degree of deference attaches to the agency's interpretation. We note at the outset that the FRA letter ruling did not result from notice and comment rulemaking or a formal adjudication. This fact, however, "does not automatically deprive that [agency] interpretation of the judicial deference otherwise its due." *Barnhart*, 535 U.S. at 221. *See also United States v. Mead Corp.*, 533 U.S. 218, 231 (2001) (stating that "the want of [notice and comment rulemaking] does not decide the case"). At the very least, FRA's determination of its jurisdiction is entitled to the degree of deference described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Mead*, 533 U.S. at 234 (noting that "*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form").

B.

Under *Skidmore*, an agency ruling is "entitled to respect" to the extent that it has the "power to persuade." 323 U.S. at 140. The force of a particular agency interpretation is measured by "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*

The FRA letter ruling represented the culmination of a decision-making process during which FRA officials met directly with TTA officials to discuss the particular characteristics of this passenger rail system. The letter ruling addressed those characteristics in light of the factors described in the Policy Statement and reached a conclusion consistent with the statute and the Policy Statement. The "thoroughness evident in [FRA's] consideration" of TTA's project lends persuasive force to the letter ruling. *See Skidmore*, 323 U.S. at 140.

The letter ruling also has persuasive force because its conclusion on jurisdiction follows from valid reasoning. Applying the principles described in its Policy Statement, FRA found that Phase I of the TTA system resembled a commuter rail operation in its primary purpose, its geographic scope, its frequency of service, and its projected rider-

ship patterns. It is undisputed that these factors were appropriate for consideration by FRA.[2]

TTA attacks the validity of FRA's reasoning on four separate grounds. First, TTA contends that FRA mistakenly characterized the TTA rail system as a regional system rather than one that served an urban area. According to TTA, the Research Triangle has urban characteristics and the rail system connecting Raleigh, Durham, and the suburbs in between should be deemed a system serving a single urban area. We agree with FRA that the statutory exclusion applies to a rapid transit system in *an* urban area, not multiple urban areas and not a metropolitan area. In the definitional statute at issue here, Congress included within the definition of "railroad" commuter or short-haul passenger service "in a metropolitan or suburban area," 49 U.S.C. § 20102(1)(A)(i), but excluded rapid transit systems "in an urban area," *id.* § 20102(1)(B). Congress plainly distinguished "an urban area" from "a metropolitan or suburban area," and FRA was correct to recognize that distinction here.

Second, TTA argues that FRA incorrectly assessed the frequency of service anticipated for the TTA rail system. FRA found that TTA's estimate of 15-minute intervals during peak hours and 30 minute intervals during off-peak hours was more similar to commuter operations than rapid transit operations. FRA further noted that even if the intervals were compressed to 10 minutes and 20 minutes, respectively, those intervals would still be less frequent than typical rapid transit operations. Contrary to TTA's argument, there is nothing internally inconsistent about these conclusions; rather, FRA determined that the TTA rail system was not even close to rapid transit, at least with respect to frequency of service. TTA's estimate that 54% of its trains would run during off-peak hours does not undermine FRA's

---

[2]We agree with TTA that the Policy Statement is "entitled to respect" only to the extent that it is persuasive. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Cunningham v. Scibana*, 259 F.3d 303, 306 (4th Cir. 2001). Since we have been presented no reason to doubt the persuasiveness of the Policy Statement itself, we cannot fault FRA for applying its principles in making its jurisdictional determination. The only question for us is whether FRA's application of its Policy Statement to TTA's rail system is persuasive.

conclusion, for although this estimate suggests that something less than "the vast bulk" of trains would run during peak hours, *see* 65 Fed. Reg. at 42,545, it remains true that TTA's overall frequencies are at the low end of commuter rail operations. The record includes comparative data supporting FRA's conclusion that TTA's frequency of service resembles commuter rail more than rapid transit, and we find FRA's analysis persuasive.

Third, TTA argues that FRA should not have relied upon TTA's environmental impact statement to conclude that TTA intends to operate a commuter service. This complaint is meritless. The Policy Statement makes relevant the major and incidental functions of the rail system, *see* 65 Fed. Reg. at 42,544-45, and FRA cited the environmental impact statement as some evidence of the major functions of the TTA rail system. FRA was entitled to consider any evidence bearing on this issue, and TTA has not offered any legitimate reason why its own representations should not be considered. Moreover, the environmental impact statement was only one of several sources of information upon which FRA relied to characterize the functions of the TTA rail system.

Fourth, TTA argues that FRA incorrectly determined that the primary purpose of the TTA system would be to provide work-related transportation. According to the Policy Statement, FRA will likely consider a rail system to be a commuter operation if "[t]he system's primary function is moving passengers back and forth between their places of employment in the city and their homes within the greater metropolitan area." 65 Fed. Reg. at 42,544. FRA determined that the primary function of the TTA system would be to facilitate commuter traffic to and from work, based upon the following facts: (1) the areas served by the rail corridor are high-employment areas, (2) the number of jobs in that corridor is expected to grow by more than 60 percent over the next two decades, (3) the locations of various stations were selected because they serve large employment bases and provide access to a large number of commuters, and (4) work-related trips will account for at least 63% of all trips on the system. On these facts, we are persuaded that the primary purpose of the TTA system is to facilitate commuter traffic in the Research Triangle, with intra-city traffic an incidental purpose. In sum, we reject TTA's contention that FRA's letter ruling reflects invalid reasoning.

Finally, TTA argues that FRA's letter ruling is inconsistent with FRA's treatment of other light-rail transit systems. TTA supplies no support for this assertion aside from its own "knowledge and belief," and it should not be given any weight. Based on its thoroughness, the validity of its reasoning, and the absence of evidence suggesting an inconsistent application of the Policy Statement, we conclude that FRA's determination of its jurisdiction has the "power to persuade" and is entitled to deference. *See Skidmore*, 323 U.S. at 140.

## III.

Although TTA may have reason to disagree with FRA's characterization of Phase I of the TTA project as commuter rail or other short-haul railroad, FRA provided a thorough and well-reasoned analysis of the TTA project. That analysis represents a fair application of the Policy Statement and a permissible interpretation of the relevant statute, and it should not be disturbed. Accordingly, TTA's petition for review is denied.

*PETITION DENIED*